May it please the Court. My name is Scott Stewart and I represent the petitioner Germán Ruvalcaba-Rosales. If I may, Judge McEwen, I'd like to try to save two minutes for rebuttal. All right. Thank you, Your Honor. In this case, the BIA held that Mr. Ruvalcaba is not entitled to withholding of removal or for relief under the Convention Against Torture. This court should reject both of those conclusions and either grant Mr. Ruvalcaba relief now or remand to the Court of Appeals. I'd like to begin by just focusing on those. On the past persecution question, this Court has repeatedly reaffirmed in a variety of cases, a line of cases, that when an applicant for withholding relief is threatened with death, particularly a series of death threats, and faces some    The record compels a finding of past persecution and the BIA cannot properly conclude otherwise. I submit that that's what happened in this case. Mr. Ruvalcaba credibly testified, as the BIA found, that he was directly threatened with death, that a political, opposing political party, the PRD Committee, where he lived in Mexico, said they would kill us, they threatened us with a weapon, a gun. The BIA itself found that he had faced continuous threats over the course of years. His father, in his absence in Mexico from 1998 to 2004, received constant threats, was the line from the record. The one time that Mr. Ruvalcaba returned to Mexico in 2004, he faced a threat again from a sheriff, a member of the police, in the town where the PRD Committee held sway. His father, when he continued to report threats, had this reprise again in 2007. And then in Mr. Ruvalcaba's record below, which was submitted in 2011, he said, yes, my father continues to receive threats. That was all topped off by the previous follow through on those threats, in this case, a beating of Mr. Ruvalcaba himself, from which he, his persecutors broke his nose. They beat him. I think you've got a strong argument on this point, but the nexus ground seems like a tougher road for you to hoe. So let me just focus on the beating that you just touched on. Yes, Your Honor. I mean, there doesn't seem to be any connection with your client's political views with respect to that beating, is there? With respect, Your Honor, I think the record shows something different. Here, Mr. Ruvalcaba testified on page 82 of the record. He said, he explained, the modus operandi of this particular political party, this opposing political party, is that they strong arm people by trying to obtain their land, to threaten them, and to threaten them to join or support their political view. And in this case, Mr. Ruvalcaba's case, to abandon his own political view. The beating was a follow through on those political related threats, and it substantiated that those threats, which he testified, were because of his and his family's political views. The beat, I mean, as I understand it, the land had already been confiscated, I guess, at that point? At that time, they'd been, they had been pushed off the land at that time, and he was returning to it. Right. But so, I mean, so he's just a random person on land that at least others believe, you know, no longer belongs to him. And why isn't that just a random act of violence against a trespasser? Oh, you, there, I don't think the record supports the trespasser view, Your Honor. But more importantly, the land was under dispute at the time. But the key point of the testimony there was that it was his persecutors who beat him. They were the ones who followed through on the previous threats. And the threats that continued after that were all based on this political opposition of their family. But isn't part of your problem that there were 25 other landowners that were also thrown off their land? Were they, were they beaten? Were they, I mean, were they also somehow threatened to join this party or get beaten or what? I mean, there's no testimony on that, is there? The farthest it goes, and Mr. Ruvalcaba offered only by way of substantiation that this other, these other landowners faced the same circumstances. He did, there isn't any evidence in the record saying that there was a nonpolitical basis for it. But I think the critical point as to the 25 other landowners, Judge Rothstein, is that Mr. Ruvalcaba testified that he himself, he himself and his family, the persecution they faced was politically based. To the extent there's evidence about the other landowners, he attempted to corroborate that and just sort of explain and contextualize it. But there isn't anything in the record to suggest that those other landowners were persecuted for, for other reasons. I was a little puzzled by the references to that, because it would seem to me that whether or not there were 25 other landowners with problems, that if he has a problem, then he can rise and fall on his own facts. Right. So maybe you can explain in what context you think the I.J. made that reference to the 25 other landowners. Right. I think the reference is confusing itself, because I agree, Your Honor, it's sort of a rise and fall under his own facts and under his own testimony about his own ordeal and the evidence related to that. I think where the I.J. went astray was the I.J. saw this only as a nonpolitical land dispute and focused only on the land aspect of it, and therefore focused on the other landowners. I think the mistake was that Mr. Ruvalcaba testified that the land cannot be separated from his political opinion. It's an integrally political dispute, and you can't just tear the two apart. But I mean, I guess I think I understand why the I.J. might have focused on the other landowners, because if those folks were targeted just because this committee wanted to get their land and had nothing to do with their political views, it sort of calls into question whether a political motivation really was behind the land grab that affected your claim. I could see it being a stronger case for the government, Your Honor, if there were some evidence in the record to support the view that the other landowners' confiscation and harm was not politically based. But there isn't that substantial evidence to support a view that this was not politically based. We don't have sort of further evidence brought forth by the government that those other set of acts against those landowners was just completely apolitical. What we do have is Mr. Ruvalcaba saying on page 155 of the record and page 82 of the record saying that this, as to him, was politically based. It was what this committee does is they try to get people to join them to support their political party and to support their kind of corrupt agenda, as in his view it's corrupt, by trying to strong-arm them, threaten them. And land is a big way they do that. And I think the substantial evidence supports, I'm sorry, Your Honor, supports that. I was just hearing kind of how your view is. If your view were sustained and there was a past persecution, then wouldn't we need to remand this for the agency, in effect, to make the determination of what the effect of that was? I think in the ordinary course that would be the right choice. I think this case may be different. For a Ventura remand, Your Honor, in Ventura the Supreme Court said that's the ordinary course. Here, I think we have a bit of a different case because there was no, there's nothing in the record to even suggest that the government could rebut that presumption. There's also a showing here based on the past persecution that Mr. Ruvalcaba has established a likelihood of future persecution, and that would independently entitle him to relief. And this Court is also- What's your strongest, what do you think the strongest facts are for that independent determination to overturn the findings here? I think the best, Your Honor, is the pervasive evidence that whenever Mr. Ruvalcaba returns to Mexico, he's persecuted, and that the persecution to him continues up as far as the record really goes here. There was a 2004 return when he got the threatening phone call. There was a 2007 acts against his father. There was a 2007 testimony that the threats continue. So it shows that this is a continuing situation. Does the fact that the political situation may have changed since the last threat was made, parties have changed, things look different, does that undermine your contention? No, Your Honor, I don't think so. And the reason is because Mr. Ruvalcaba's claim never rested on sort of the dominant party in Mexico. It rested on these government-connected members in his area who he says still holds a lot of sway in that area. So I think, and also on the government prong, there's no need that it actually be members of the government. It can be, and it's shown in this case, to be people who the government will not control and members of the government. And with that, Your Honor, I'll try to save the question. Well, of course, now we've moved from PON to PRE also. It's had more changes in Mexico. So we'll hear from the government. May it please the Court, Greg Mack, Counsel for the Respondent, the Attorney General of the United States. We are here today because in 2011, the Department of Homeland Security decided to reinstate the 2005 order of expedited removal to Mexico against Petitioner. In response to this decision to reinstate his removal order, that is, in fact, he's already facing an order of removal here, Petitioner expressed a fear of persecution and torture if he was returned to Mexico. Under the applicable standard of review, which is substantial evidence, the record of evidence does not compel a reasonable person to conclude that there's a clear probability of persecution or torture upon this petitioner's return to Mexico. In Petitioner's own words at page 311 of the record, this matter involves a land dispute that his father lost, a land dispute that has effectively been over since 2004. So under these facts, what the immigration judge and the board were facing, spinning it forward, was whether there was a clear probability of persecution or torture in Mexico. And on this record, both the immigration judge and the board concluded that no, there would not be a clear probability of persecution and torture in Mexico if he were returned in 2014. The immigration judge and the board recently concluded that there was no persecution here, that these events did not rise to the level of persecution and they lacked a nexus with a political opinion. With respect to the nexus point on political opinion, to be sure, this party did go after the land. The land was confiscated and the father lost the judicial case. But the petitioner also said that the committee wanted the properties to sell for their own benefit. That's at page 407 of the record. And the committee told his father that if he supported taking the land of others, they would give him assistance. Now, in this case, what the statute requires is that political opinion be the essential reason for the persecution in this case. And under this record, you cannot say, and the record doesn't compel the conclusion that, a central reason for this land confiscation was the petitioner's political opinion. How can you not say that when they say, basically, if you ditch PAN and come with us and join us, then we're going to basically make it possible for you to get your own political faction? It seems to me that if you credit his testimony as true, which they did, how do you get any more intertwined between political opinion and conduct than the testimony you just cited? Because again, petitioner said, as part of his reasonable fear interview, that the committee wanted the properties to sell for their own benefit. So there's an overtone of greed in this case, of just wanting land. So given that the statute requires it. Yeah, I mean, just because they're a political organization doesn't mean they're not greedy. I mean, obviously it's a land grab, one way or the other. The question is, is there some political motive underlying it? And everything that he testified to related to his potentially being pressured to change parties or change affiliations and to join up with them. So what it doesn't, I don't see how the fact that they might be greedy changes it. Well, it changes in the sense that given that the Real ID Act changed the law in 2005, a central reason for the persecution has to be the political opinion. And on this record, given a statement also that they wanted the properties to sell for their own, there's the possibility for the immigration judge and the board to say, this does not have political overtones. This has a land grab overtone. This is a land dispute, effectively, at the end of the day. And under our standard of review here, the record evidence doesn't compel the conclusion that a political opinion was the reason for the land grab here, given the petitioner's testimony that, at the reasonable fear interview, that they wanted the property to sell for their own. To be sure, they're in an opposite political party. This petitioner is in another political party. But that should, in and of itself, that doesn't mean that there are political overtones in this case. No, but in and of itself, it wouldn't, except that they said, we won't do this to you if you'll change parties. I mean, that is about as direct as you can get. That's where I'm having trouble with your argument, because for sure they're going to sell it and get a land grab and get some money, whatever. But that doesn't mean, that doesn't undo the fact that they tell him that if he wrote again, as well in the threats. So I'm having some trouble just trying to, you're trying to disaggregate the political testimony from the land grab in some way. And I think that's where the board looks at also saying, well, there's these other 25 landowners here, and given that we don't have any evidence about their political background, that lends credence to, this is a land grab versus a political land grab. And the board says, there's insufficient evidence that his refusal was a central reason for the confiscation of his land, especially given the lack of evidence as to the political affiliation of the other 25 landowners who lost their land. There may have been 25 other landowners who were also part of his political party in this case. We don't have that evidence. And given that the record has to compel this court to conclude otherwise, the record doesn't support that. Let me try it a different way. Let's just assume that it's a, it's a total land grab with no politics. So we take all the land. However, to get your land back, you have to join my party. So we don't know, it wouldn't matter then about the other people, whether they took it just for money purposes. But for him, they're saying basically you can get your land back, but you have to join the party or join this committee. That is a political connection, is it not, in terms of, then they of course follow that he's had the, he has the beating and then he has the future threats. He has the beating in 1997 and he has the time around the time of the, right. And he has the telephone threat in 2004. And what an immigration judge would have to do at that point is look at that particular evidence and spin it forward and say, well, okay, they said to get it back, you would have to join our political party. What is the state of events today in 2014 as to whether there's a clear probability of persecution and torture going forward in this case? Because what withholding of removal asks and what withholding of removal under the Convention Against Torture asks is a future question. What can we say about the prediction about his predicament going forward in Mexico? 1997 beating, 2004 telephone threat, land disputes been over for 10 years. They tell him back in 1997 or even 2004 to get your property back, you've got to join our political party. But what's going on in 2014? Well, if there were past persecution, then he would have a presumption, but. A rebuttable presumption. A rebuttable presumption. And then the government would need to come in and show that, well, Mexico has basically changed the whole face of things. Changed the whole face of things as well as I believe. But that would be something on which there would have to be a hearing if there were past persecution, right? That's correct. There would be. We can't really sit here today and say, just because we all know in our head things have changed in Mexico, but that's not what's in the record. Right. Given Ventura, the court would have to send it back if it found past persecution to sort of change the evidentiary calculus that the government would have to rebut that finding that there is a presumption of a clear probability, but in that fashion, the board and the immigration judge would also have changing country conditions possibly as well as relocation. Remember, this is a land dispute. You stay away from the land, you've got the entire state of our country of Mexico to be in. So all that would come out in him if we were to remand it. And I know that when he went back, he went to Chihuahua, got the phone call, but he was from Jalisco. So you're right, it's a big country. Right. And he has an entire country to live in apart from this land dispute. The land dispute, the land is static. The land is where it is. You stay away from the land, presumably you won't have a problem. Telephone threats alone is not going to rise to the level of Again, we're speaking in the future context if the court agrees that there's past persecution. Our overall point, you're right. If there's a question. My question on that really went to the case we have, Samoa Cava. You're probably familiar because I think it was cited in both briefs where basically our court said if you have repeated threats and especially when there's a conjunction of some kind of abuse, then it requires a finding of past persecution. And I read that language and then I look at this case and wonder why it doesn't really fall right inside that case. I'd appreciate your thoughts on that. And I think that's important as well, Your Honor. I think in Petitioner's reply brief, Petitioner said the government didn't address Samoa Cava. In Petitioner's brief, if you look at it, what Petitioner said was, look, Samoa Cava reinforces these three other cases that we cited. Reyes-Guerrero, Rano, and Njunga case, if I'm mentioning correctly. We addressed those three cases in our brief. And I think the overall point is, this court I think has said itself, we have cases going all over the place with respect to past persecution, whether it rises to the level of persecution. So you can't just say Samoa Cava covers this case. We can plug it in, in some sort of threat or persecution calculus and come out the other end and say, this rises to the level of persecution because we don't have a persecution matrix that says you take two threats on the X-axis and two beatings on the Y-axis and that plugs out to extreme circumstances. These are fact-dependent cases. So you can't just say small Neocoba creates a death threats plus matrix and decided this case. The plus is important. We may have a death threat plus one beating. We may have a death threat plus five beatings and five threats. Or we may have, as I would suggest in this case, death threats plus a one-off. This is a beating in 1997. And again, the immigration judge and the board have to spin this forward and ask, is there a clear probability of persecution and torture going forward in Mexico? And given this court's standard of review, the record doesn't compel that contrary conclusion. Thank you, Your Honors. Thank you. Just two quick points, Your Honor. On the nexus point that Judge McEwen was asking about, I'd like to cite the court's case in Kabidi where the court said that when a persecutor has, quote, linked their acts with the political views of the petitioner's family, the record compelled the finding of past persecution. And as a result in that case, when the petitioner was being persecuted and the persecutor said, quote, you had your time in the previous government, end quote, this court found that nexus was compelled in that case and the IJ couldn't properly conclude otherwise. As for the death threats plus in this case, I'd emphasize, Your Honor, that this case falls, you know, well inside the established line of what must be compelled to find past persecution. In Rwanda, for example, and other cases, there have been cases where there were threats plus an unsuccessful attempt to chase down the petitioner. There have been threats and then harm to the petitioner's family. Here there were threats and the petitioner was successfully hunted down. There were threats and the petitioner's family was harmed. And I just emphasize the record evidence that this was not just sort of a 1998 incident and a 2004 incident. There's also all of this evidence, which is critical under the Giugna case, Your Honor, in 2007 with continued threats. And then Mr. Rubalcava's testimony in his sworn statement that in 2011, his father is still receiving these threats. And I see my time's up. Thank you, Your Honor. Thank you. Thank both of you for your arguments today. The case of Rubalcava versus Holder is submitted.
judges: Rothstein, McKEOWN, WATFORD